No. _____

In the
## Supreme Court of the United States

_____

TRANS UNION LLC,

*Petitioner,*

v.

SERGIO L. RAMIREZ,

*Respondent.*

_____

**On Petition for Writ of Certiorari to the
United States Court of Appeals
for the Ninth Circuit**

_____

**PETITION FOR WRIT OF CERTIORARI**

_____

JULIA B. STRICKLAND   PAUL D. CLEMENT
STEPHEN J. NEWMAN      *Counsel of Record*
CHRISTINE E. ELLICE    ERIN E. MURPHY
STROOK & STROOK        MATTHEW D. ROWEN
& LAVIN LLP            KIRKLAND & ELLIS LLP
2029 Century Park E.   1301 Pennsylvania Ave., NW
Los Angeles, CA 90067  Washington, DC 20004
                       (202) 389-5000
                       paul.clement@kirkland.com

*Counsel for Petitioner*

September 2, 2020

## QUESTIONS PRESENTED

This petition arises out of a Fair Credit Reporting Act class action in which the named plaintiff suffered atypical injuries and the vast bulk of the class suffered no Article III injury at all.  The named plaintiff claimed that an inaccurate credit report hindered his effort to secure credit, caused him embarrassment in front of family, and led him to cancel a vacation.  Yet he sought to represent a class of thousands of individuals, the vast majority of whom (>75%) never had a credit report disseminated to any third party, let alone suffered a denial of credit or other injury anything like the class "representative."  The trial court nonetheless let the class proceed on the theory that the absent class members all suffered Article III injury and that the vast differences between the experiences of the named plaintiff and the class he purported to represent were immaterial.  The results were predictable.  Having heard only about the named plaintiff's entirely atypical injuries, the jury awarded the entire class statutory damages near the statutory maximum and then awarded classwide punitive damages that dwarfed the statutory damages.  In a 2-1  decision, the Ninth Circuit then affirmed across the board, save for minimally trimming the punitive damages award.

The questions presented are:

1. Whether either Article III or Rule 23 permits a damages class action where the vast majority of the class suffered no actual injury, let alone an injury anything like what the class representative suffered.

2. Whether a punitive damages award that is multiple times greater than an already-substantial

ii

classwide award of statutory damages, and is orders of magnitude larger than any actual proven injury, violates due process.

iii

## PARTIES TO THE PROCEEDING

Petitioner, and defendant-appellant below, is TransUnion LLC.

Respondents, and plaintiffs-appellees below, are Sergio L. Ramirez and 8,184 absent class members "to whom Trans Union sent a letter similar in form to the March 1, 2011 letter Trans Union sent to [Ramirez] regarding 'OFAC (Office of Foreign Assets Control) Database' from January 1, 2011-July 26, 2011."

iv

## CORPORATE DISCLOSURE STATEMENT

Trans Union LLC is a wholly owned subsidiary of TransUnion Intermediate Holdings, Inc.  TransUnion Intermediate Holdings, Inc. is wholly owned by TransUnion.  TransUnion is a publicly traded entity with the ticker symbol TRU.  Investment funds affiliated with T. Rowe Price Group, Inc., a publicly traded entity with the ticker symbol TROW, own more than 10 percent of TransUnion's stock.

v

## STATEMENT OF RELATED PROCEEDINGS

This case arises from the following proceedings:

- *Trans Union LLC v. Sergio L. Ramirez*, No. 14-80109 (9th Cir.) (opinion denying permission to appeal district court's certification of class, filed Dec. 2, 2014);

- *Sergio L. Ramirez v. Trans Union, LLC*, No. 3:12-cv-00632-JSC (N.D. Cal.) (order certifying class, filed July 24, 2014) (judgment signed June 21, 2017); and

- *Sergio L. Ramirez v. Trans Union LLC*, No. 17-17244 (9th Cir.) (opinion affirming in large part and vacating and remanding in part with instructions to reduce punitive damages, issued Feb. 27, 2020).

There are no other proceedings in state or federal trial or appellate courts, or in this Court, directly related to this case within the meaning of this Court's Rule 14.1(b)(iii).

# TABLE OF CONTENTS

QUESTIONS PRESENTED ........................................ i

PARTIES TO THE PROCEEDING ......................... iii

CORPORATE DISCLOSURE STATEMENT ........... iv

STATEMENT OF RELATED PROCEEDINGS ........ v

TABLE OF AUTHORITIES .................................... viii

PETITION FOR WRIT OF CERTIORARI ............... 1

OPINIONS BELOW .................................................. 4

JURISDICTION ....................................................... 5

CONSTITUTIONAL AND STATUTORY
   PROVISIONS INVOLVED ..................................... 5

STATEMENT OF THE CASE .................................. 5

   A.   Legal and Factual Background................... 5

   B.   District Court Proceedings........................ 10

   C.   The Ninth Circuit's Opinion ...................... 13

REASONS FOR GRANTING THE PETITION ....... 16

I.   The Decision Below Conflicts With Cases Of
   This Court And Other Circuits On Basic
   Principles Of Article III And Rule 23 ............... 18

   A.   The Conclusion That Every Absent Class
      Member Had Article III Standing Is
      Wrong and Creates a Circuit Split ........... 18

   B.   The Conclusion That Ramirez Was
      Typical of the Class Defied Reality as
      Well as This Court's Rule 23 Precedents .. 26

II.   The Ninth Circuit's Punitive Damages
   Analysis Defies Due Process And This Court's
   Cases ................................................................. 28

vii

III. The Questions Presented Are Exceptionally
Important............................................................ 31

CONCLUSION ........................................................ 36

APPENDIX

Appendix A

Opinion, United States Court of Appeals for the Ninth Circuit, *Ramirez v. TransUnion LLC*, No. 17-17244 (Feb. 27, 2020) ........................................... App-1

Appendix B

Order, United States Court of Appeals for the Ninth Circuit, *Ramirez v. TransUnion LLC*, No. 17-17244 (Apr. 8, 2020) ........................................... App-59

Appendix C

Order, United States District Court for the Northern District of California, *Ramirez v. TransUnion LLC*, No. 12-cv-00632-JSC (Nov. 7, 2017)........................................... App-61

Appendix D

Relevant Constitutional and Statutory Provisions and Federal Rule.................... App-91

U.S. Const. art. III, §§1-2 ......................... App-91

U.S. Const. amend. XIV, §1....................... App-92

15 U.S.C. §1681e....................................... App-92

15 U.S.C. §1681g ...................................... App-96

15 U.S.C. §1681n ..................................... App-117

Fed. R. Civ. P. 23 ..................................... App-118

viii

# TABLE OF AUTHORITIES

## Cases

*Am. Express Co. v. Italian Colors Rest.*,
    570 U.S. 228 (2013)................................................ 31

*Barr v. Am. Ass'n of Pol. Consultants*,
    140 S.Ct. 2335 (2020)............................................ 34

*Braitberg v. Charter Commc'ns, Inc.*,
    836 F.3d 925 (8th Cir. 2016)................................. 24

*Califano v. Yamasaki*,
    442 U.S. 682 (1979)................................................ 31

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)...................................... 3, 19, 21

*Coopers & Lybrand v. Livesay*,
    437 U.S. 463 (1978)................................................ 32

*Cortez v. Trans Union LLC*,
    617 F.3d 688 (3d Cir. 2010) .................................... 7

*Dreher v. Experian Info. Sols., Inc.*,
    856 F.3d 337 (4th Cir. 2017)........................... 22, 25

*Exxon Shipping Co. v. Baker*,
    554 U.S. 471 (2008)................................................ 28

*Feltner v. Columbia Pictures Television, Inc.*,
    523 U.S. 340 (1998)................................................ 32

*Flecha v. Medicredit, Inc.*,
    946 F.3d 762 (5th Cir. 2020)........................... 17, 25

*Gillespie v. Equifax Info. Servs., L.L.C.*,
    484 F.3d 938 (7th Cir. 2007)............................. 6, 22

*Groshek v. Time Warner Cable, Inc.*,
    865 F.3d 884 (7th Cir. 2017)................................. 25

*Gubala v. Time Warner Cable, Inc.*,
    846 F.3d 909 (7th Cir. 2017)................................. 24

ix

*Huff v. TeleCheck Servs., Inc.*,
  923 F.3d 458 (6th Cir. 2019)................................... 25

*Lompe v. Sunridge Partners, LLC*,
  818 F.3d 1041 (10th Cir. 2016)............................. 30

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)............................................. 23

*Massachusetts v. EPA*,
  549 U.S. 497 (2007).............................................. 26

*On Davis v. The Gap, Inc.*,
  246 F.3d 152 (2d Cir. 2001) .................................. 29

*Owner-Operator Indep. Drivers Ass'n, Inc.*
  *v. U.S. Dep't of Transp.*,
  879 F.3d 339 (D.C. Cir. 2018)......................... 17, 24

*Parker v. Time Warner Ent. Co.*,
  331 F.3d 13 (2d Cir. 2003) .................................... 33

*Safeco Ins. Co. of Am. v. Burr*,
  551 U.S. 47 (2007).............................................. 5, 15

*Spokeo, Inc. v. Robins*,
  136 S.Ct. 1540 (2016)................................... *passim*

*St. Louis, I. M. & S. Ry. Co. v. Williams*,
  251 U.S. 63 (1919)................................................ 29

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003)....................................... *passim*

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009).............................................. 26

*United States v. SCRAP*,
  412 U.S. 669 (1973).............................................. 23

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)......................................... 26, 31

x

*Williams v. ConAgra Poultry Co.*,
   378 F.3d 790 (8th Cir. 2004) ................................... 31

**Statutes**

12 U.S.C. §3417(a) ............................................... 34

15 U.S.C. §1640(a) ............................................... 34

15 U.S.C. §1681a(d) ............................................... 5

15 U.S.C. §1681a(f) ................................................. 5

15 U.S.C. §1681a(g) ............................................. 10

15 U.S.C. §1681e(b) ........................................ 6, 10

15 U.S.C. §1681g(a) ..................................... 6, 11, 21

15 U.S.C. §1681g(c) ..................................... 6, 11, 21

15 U.S.C. §1681n ................................................. 34

15 U.S.C. §1681n(a) ............................................. 29

15 U.S.C. §1692k(a) ............................................. 34

18 U.S.C. §248(c) ................................................. 34

18 U.S.C. §2520 ................................................... 34

**Rule and Regulation**

Fed. R. Civ. P. 23(a) .............................................. 26

31 C.F.R. §501 app. A, II ....................................... 7

**Other Authorities**

FTC, *Report to Congress Under Sections 318
   and 319 of the Fair and Accurate Credit
   Transactions Act of 2003* (Dec. 2004) ..................... 7

James A. Henderson, Jr., *The Impropriety of
   Punitive Damages in Mass Torts*, 52 Ga. L.
   Rev. 719 (2018) ................................................... 32

xi

*Office of Foreign Assets Control - Santions Programs and Information*, U.S. Dep't of the Treasury, http://bit.ly/1VZNDSI (last visited Aug. 31, 2020) .............................................. 7

*The 2018 Carlton Fields Class Action Survey* (2018), https://bit.ly/2WBMs17 ............................. 32

**PETITION FOR WRIT OF CERTIORARI**

The jury's verdict here reflected a perfect storm of standing, class certification, and punitive damages problems, combining to give rise to a multimillion-dollar damages award in a case with no proven injury to anyone beyond the named plaintiff. In the course of affirming more than $40 million in statutory and punitive damages for highly technical (and highly debatable) violations of the Fair Credit Reporting Act ("FCRA"), the Ninth Circuit eviscerated critical Article III, Rule 23, and due process constraints, thereby paving the way for one highly atypical plaintiff to recover massive damages on behalf of thousands of uninjured class members. That outlier decision conflicts with the decisions of this Court and other circuits, and it cries out for this Court's review. And given that this is the rare class action that was litigated to final judgment, this is an ideal case in which to consider these critical issues.

Sergio Ramirez suffered difficulty in obtaining credit and embarrassment in front of family members when an automobile dealer received a credit report indicating that Ramirez's name matched a name on a government list of persons with whom U.S. businesses may not transact. In response, he initiated a class action alleging three violations of FCRA's procedural requirements. But Ramirez was not content to represent a class of individuals who, like himself, had allegedly inaccurate information disseminated to potential lenders—let alone individuals who experienced difficulty in obtaining credit as a result. Instead, he sought to represent a much larger class of consumers who never had their credit reports

2

disseminated to any third party during the class period and instead simply received the information themselves as part of a statutory process that allows consumers to request a copy of their credit reports so that they can identify and correct any errors. In fact, Ramirez *stipulated* that more than 75% of his proposed class did *not* have a report disseminated to a third party during the class period. And he made no effort to prove that any other class member ever read the letter from TransUnion or was even aware that such a letter had been sent, let alone that any other class member suffered injury (or even embarrassment) on account of the claimed deficiencies in how TransUnion provided the "potential match" information.

The district court nonetheless allowed the class action to proceed, with the jury hearing at trial only about Ramirez and his entirely atypical injury and experiences. The results were predictable. The jury awarded every member of the 8,185-member class near the maximum in statutory damages and thousands more in punitive damages, for a total award of over $60 million in a case where the vast bulk of class members never had a credit report disseminated to a third party, let alone suffered any injury as a result. A divided panel of the Ninth Circuit affirmed in large measure, pausing only to reduce the punitive damages award to four times the $8 million statutory damages award, even as it acknowledged that the latter was "quite substantial." App.48. *But see State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) ("When compensatory damages are substantial, then a … ratio[] perhaps only equal to compensatory damages[] can reach the outermost

3

limit of the due process guarantee."). That decision is wrong at every turn.

First, as Judge McKeown explained in her dissent, the majority's conclusion that every class member suffered Article III injury-in-fact simply because TransUnion's credit files contained allegedly inaccurate information about them cannot be reconciled with this Court's precedent or decisions of other courts faithfully applying it. As this Court has made clear, Article III requires an injury that is both "concrete and particularized," *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1545 (2016) (emphasis omitted), and "*certainly impending*," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Applying those principles, the D.C. Circuit has squarely held that plaintiffs lack standing to seek damages under FCRA based on the bare existence in their credit files of information never disseminated to any third party. And multiple circuits have concluded that plaintiffs lack standing to challenge allegedly deficient disclosures when there is no evidence that they even read, let alone failed to understand, them.

While the Article III standing rules applied by most circuits would stop a class like this one at the threshold, the Ninth Circuit's treatment of Rule 23 is a profound outlier. Even if absent class members who never had their credit information disseminated to a third party somehow crossed the Article III threshold, their injuries were nothing like the actual, concrete injuries suffered by the named plaintiff. Yet the Ninth Circuit found no problem with a trial focused on Ramirez's "unique circumstances" to the exclusion of any "story of the absent class members." App.51, 53

4

(McKeown. J. concurring in part and dissenting in part). Adding insult to (lack of) injury, the court also refused to reduce the *punitive* damages award below a 4:1 ratio to an $8 million *statutory* damages award— even though statutory damages are not a measure of the actual harm the plaintiffs suffered, *State Farm*, 538 U.S. at 425, but are instead designed to accomplish the same punishment and deterrence objectives as punitive damages. Indeed, Ramirez's lawyers urged the jury to award the highest possible statutory damages to impose the "maximum penalty" on TransUnion. CA9.ER258.

The combined effect of those profoundly flawed holdings is that thousands of absent class members have been awarded thousands of dollars for injuries that never occurred. Indeed, it is no exaggeration to say that, for many (if not most) of the 8,184 absent class members, their first indication that they were "injured" will come when they receive a $4,921.10 check (reduced by class counsel's cut) in the mail. Making matters worse, the decision below provides a roadmap for how to (ab)use statutory damages provisions by using atypically sympathetic plaintiffs to secure massive awards on behalf of uninjured individuals, and then use those statutory damages to justify outsized punitive damage awards. Any one of the majority's missteps en route to that untenable result readily warrants this Court's review. Together, they compel it.

## OPINIONS BELOW

The Ninth Circuit's opinion is reported at 951 F.3d 1008 and reproduced at App.1-58. The district court's order denying TransUnion's post-trial motions

5

is available at 2017 WL 5153280 and reproduced at App.61-90.

## JURISDICTION

The Ninth Circuit issued its opinion on February 27, 2020, and issued its order denying rehearing en banc on April 8, 2020. App.1-60. On March 19, 2020, this Court "extended" "the deadline to file any petition for a writ of certiorari due on or after" that date "to 150 days." This Court has jurisdiction under 28 U.S.C. §1254(1).

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

The relevant provisions of FCRA, 15 U.S.C. §§1681-81x, are reproduced at App.92-118. Federal Rule of Civil Procedure 23 is reproduced at App.118-28. Article III, §§1-2 of the United States Constitution is reproduced at App.91-92. The Due Process Clause, U.S. Const. amend. XIV, §1, is reproduced at App.92.

## STATEMENT OF THE CASE

### A.  Legal and Factual Background

1. Congress enacted FCRA "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). To that end, FCRA "regulates the creation and the use of 'consumer report[s]' by 'consumer reporting agenc[ies]' for certain specified purposes, including credit transactions, insurance, licensing, consumer-initiated business transactions, and employment." *Spokeo*, 136 S.Ct. at 1545 (footnotes omitted); *see* 15 U.S.C. §1681a(d)(1) (defining "consumer report"); *id.* §1681a(f) (defining "consumer reporting agency").

6

"FCRA imposes a host of requirements concerning the creation and use of consumer reports." *Spokeo*, 136 S.Ct. at 1545. Three of its procedural requirements are at issue here. The first is §1681e(b), which falls under FCRA's "Compliance procedures" section and requires consumer reporting agencies to "follow reasonable procedures to assure maximum possible accuracy" when preparing a credit report. 15 U.S.C. §1681e(b). The other two are disclosure requirements. Under §1681g(a)(1), each "consumer reporting agency shall, upon request, … clearly and accurately disclose to the consumer … [a]ll information in the consumer's file." And under §1681g(c)(2), each "consumer reporting agency shall provide to a consumer, with each written disclosure," a "summary of rights" as outlined in §1681g(c)(1). The "primary purpose[]" of these latter requirements "is to allow consumers to identify inaccurate information in their credit files and correct this information via the grievance procedure established under §1681i." *Gillespie v. Equifax Info. Servs., L.L.C.*, 484 F.3d 938, 941 (7th Cir. 2007).

2. In addition to preparing consumer credit reports, TransUnion offers a product variously known as "OFAC Name Screen Alert," "Name Screen," or "OFAC Advisor." OFAC refers to the U.S. Treasury Department's Office of Foreign Assets Control, which "administers and enforces economic and trade sanctions based on US foreign policy and national security goals against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy or economy of the

7

United States." *Office of Foreign Assets Control - Santions Programs and Information*, U.S. Dep't of the Treasury, http://bit.ly/1VZNDSI (last visited Aug. 31, 2020). OFAC publishes a list of individuals, known as specifically designated nationals, or "SDNs," with whom U.S. businesses are forbidden to transact; doing business with an individual on the OFAC list "may result in civil as well as criminal penalties." *Cortez v. Trans Union LLC*, 617 F.3d 688, 696, 701 (3d Cir. 2010); *see* 31 C.F.R. §501 app. A, II. Businesses use Name Screen to assist in complying with their OFAC obligations.

When this litigation arose, Name Screen worked as follows: When a lender ran a credit-check on an applicant, in addition to pulling the individual's credit report, TransUnion would use third-party software and data to screen the person's name against the OFAC list. If the name appeared to match that of an individual on the list, TransUnion would place an alert on the report, stating that the "name" was a "potential match" to a name on the OFAC list. App.6-7.

The reporting of "potential matches" to names on the OFAC list, even though other information (like date of birth) could disprove an actual match, is part of the trade-off inherent in the credit-check process. "[A] 'stricter' matching algorithm" could "reduce[] inaccuracy," *i.e.*, false positives. FTC, *Report to Congress Under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003* at 46 (Dec. 2004). But it would also mean that "incompleteness"—*i.e.*, false *negatives*—"will increase," *id.*, which is no small problem for

8

businesses given the harsh penalties for doing business with an SDN. In light of those penalties, lenders have a strong interest in an OFAC product that casts a wide initial net and then relies on a lender's human judgment to determine whether a credit applicant whose name *potentially* matches an SDN's is *actually* on the OFAC list.

Given the limited nature of the information supplied, TransUnion made crystal clear to its customers that a Name Screen alert should be the beginning, not the end, of their OFAC screening. Not only did TransUnion advise that clients "shall not deny or otherwise take any adverse action against any consumer based solely on [Name Screen]," CA9.ER393, but its terms of service further provided:

> Client further certifies that in the event that a consumer's name matches a name contained in the information, it will contact the appropriate government agency for confirmation and instructions. Client understands that a "match" may or may not apply to the consumer whose eligibility is being considered by Client, and that in the event of a match, Client should not take any immediate adverse action in whole or in part until Client has made such further investigations as may be necessary (i.e., required by law) or appropriate (including consulting with its legal or other advisors regarding Client's legal obligations).

CA9.ER212 (emphases omitted).

3. On February 28, 2011, Sergio Ramirez and his wife visited Dublin Nissan along with his father-in-

9

law, looking to buy a car.  Both Ramirez and his wife
completed a credit application.  Despite TransUnion's
express instruction that reports should describe an
individual's name only as a "*potential* match" to a
name on the OFAC list (as opposed to a "match"), the
advisory on Ramirez's report, which the dealer
obtained through a third-party reseller called
DealerTrack, noted that the "INPUT NAME
MATCHES NAME[S] ON THE OFAC DATABASE,"
and listed two names:  Sergio Humberto Ramirez
Aguirre, born 11/22/1951; and Sergio Alberto Cedula
Ramirez Rivera, born 1/14/196*.  App.4.  Respondent
is neither of those individuals, and he has a different
birthdate.  The dealership nonetheless recommended,
in violation of TransUnion's express instructions, that
Ramirez and his wife purchase the car in her name
alone, which they did.

Ramirez called TransUnion the next day.  The
person with whom he spoke informed him that there
was no OFAC alert in his report.  Ramirez asked for a
copy of his file; TransUnion mailed him one; the file
did not include any OFAC information.  A few days
later, however, Ramirez received a separate letter
from TransUnion, dated March 1, 2011—the same
day he called TransUnion—that stated:

> [Y]ou recently requested a disclosure of your
> TransUnion credit report.  That report has
> been mailed to you separately.  As a courtesy
> to you, we also want to make you aware that
> the name that appears on your TransUnion
> credit file "SERGIO L. RAMIREZ" is
> considered a potential match to information
> listed on the [OFAC] Database.

10

App.6. The letter also explained the OFAC list, provided the "potential match[es]," and advised that "[i]f you have any additional questions or concerns, you can contact TransUnion at 1-855-525-5176." *Id.*; CA9.ER467.

That information was sent in a separate mailing because the OFAC information was not housed in the files TransUnion keeps on consumers; rather, it was generated through a screen performed only when a lender actually requested a credit check or (as in Ramirez's case) a consumer requested a copy of his or her credit file.[1] After receiving the letter, Ramirez contacted TransUnion via the number it provided and succeeded in getting TransUnion to exclude the OFAC alert from all of his future credit reports. CA9.ER413-16. But in the meantime, Ramirez canceled an impending vacation to Mexico out of concern about the alert. CA9.ER257-28.

## B. District Court Proceedings

1. Ramirez sued, alleging that TransUnion violated its obligation under FCRA to maintain reasonable procedures to assure maximum possible accuracy of the information in its consumer reports. *See* 15 U.S.C. §1681e(b). He also alleged that TransUnion violated two additional FCRA procedural requirements. First, he alleged that TransUnion violated its obligation to provide consumers, upon request, with all information in their files, *see id.*

---

[1] "The term 'file,' when used in connection with information on any consumer, means all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how the information is stored." 15 U.S.C. §1681a(g).

11

§1681g(a), because it provided the OFAC "potential match" information in a separate mailing sent contemporaneously with his credit file. Second, he alleged that TransUnion violated its obligation to provide consumers with a summary of their rights with each file disclosure, *see id.* §1681g(c), because it included the summary in the mailing containing his credit file, but not in the contemporaneous-but-separate OFAC-alert mailing. Ramirez alleged that these violations were willful, and that he was therefore entitled to statutory and punitive damages under §1681n(a). App.15.

Although Ramirez's claims stemmed from his unique experience and injuries—namely, having an OFAC alert disseminated to a lender with a report describing his name as a "match" rather than a "potential match," suffering resulting credit complications at a retail outlet in front of his wife and father-in-law, and cancelling his planned vacation as a result—he sought to certify a class of very differently situated individuals. In particular, he sought to include in his class everyone who received a letter from TransUnion at their mailing address between January and July 26, 2011, informing them that their name was a "potential match" to one on the OFAC list. App.14; CA9.ER40-41. So defined, the class included individuals who received their own credit information at home but never had their reports sent to any third party. Indeed, Ramirez stipulated that less than 25% of class members had a report disseminated to a third party during the class period, App.14-15, and he offered no evidence that anyone besides himself was ever hindered in obtaining credit due to an OFAC alert.

12

The district court acknowledged the "litany of unique facts involved with [Ramirez's] claims," as well as the fact that Ramirez had provided no reason to believe that anyone else in the class suffered any adverse consequences due to the alleged violations. Dist.Ct.Dkt.140 at 12. But it nonetheless certified the class over TransUnion's objections that the other class members lacked standing and that Ramirez was radically atypical of the class he purported to represent, finding the distinctions between Ramirez and the absent class members "not material." Dist.Ct.Dkt.140 at 12, 24. TransUnion moved to decertify after this Court decided *Spokeo*, but the district court denied that motion. Dist.Ct.Dkt.209.

2. Although Ramirez's experiences were entirely atypical of the broad class he purported to represent, "the trial … opened with class counsel telling jurors that they would learn 'the story of Mr. Ramirez'" and closed with a dramatic narration of Ramirez's unique experience at the car dealership, with scant evidence of anyone else's experiences in between. App.53 (McKeown, J., concurring in part and dissenting in part). Indeed, "the hallmark of the trial was the absence of evidence about absent class members." App.54.

Ramirez presented no evidence of absent class members' purported injuries because there was none. Ramirez stipulated that only 1,852 of the 8,814 absent class members had a report disseminated to a third party during the class period—and even as to those 1,852, he provided no evidence about the nature or impact of the dissemination. Nor did Ramirez introduce any evidence that any absent class member

13

even opened the mailings from TransUnion, let alone that anyone was confused or distressed on account of receiving the requisite information about their credit files in two contemporaneous mailings instead of one. In short, while the jury heard repeatedly of Ramirez's humiliation at the Nissan dealership and resulting injuries, *see, e.g.*, CA9.ER257-28 ("He was scared. He was embarrassed. He was shocked. He canceled his vacation to Mexico because he wasn't sure what was going to happen…."), it heard nothing about the experience of a typical class member.

Having heard only of Ramirez's highly atypical experience, the jury found for the class on all claims and awarded every class member $984.22 in statutory damages—just shy of the $1,000 statutory maximum under §1681n(a). App.72. The jury awarded an additional $6,353.08 per class member in punitive damages—6.5 times the statutory damages award and incalculably higher than any actual proven damage— bringing the total verdict for the class to more than $60 million. App.78.

### C.  The Ninth Circuit's Opinion

Over a dissent from Judge McKeown, the Ninth Circuit affirmed all aspects of the proceedings, except the punitive damages award, which it found unconstitutionally excessive but reduced only to a 4:1 ratio of punitive damages to statutory damages (not actual harm). The majority began by agreeing with TransUnion (and Judge McKeown) "that each member of a class certified under Rule 23 must satisfy the bare minimum of Article III standing at the final judgment stage of a class action in order to recover monetary damages in federal court." App.17. But it then

14

proceeded to find that every class member had standing, even though Ramirez stipulated that more than 75% of them never had a credit report disseminated to a third party and "presented no evidence about the consequences of dissemination of the reports for" the rest. App.55 (McKeown, J., concurring in part and dissenting in part).

On the reasonable-procedures claim, the majority held that the bare fact "that TransUnion made [credit] reports available to numerous potential creditors and employers"—*i.e.*, the bare fact that a report would have been provided if, contrary to fact, a creditor had asked for one—"suffic[ed] to show a material risk of harm to the concrete interests of all class members." App.27. On the disclosure claims, the majority held that the mailings were "inherently shocking and confusing" and thus that every class member suffered concrete injury simply by virtue of having received two envelopes instead of one, and having received a statement of rights in only one of those two envelopes, even though Ramirez presented no evidence that any absent class member so much as opened the mailings, let alone experienced any "shock or confusion." App.32 n.10.

Turning to class certification, the majority did not dispute that, of the 8,185-member class, only "Ramirez's alert stated that he was a match" (as opposed to "a *potential* match"), only "Ramirez was denied credit because of the alert," and only Ramirez "spent significant time and energy trying to remove the alert." App.39. Yet it summarily concluded that "these differences do not defeat typicality." App.39. According to the majority, "the unique aspects of

15

Ramirez's claims"—including, *e.g.*, the fact that he was *actually hindered in seeking credit*, rather than exposed (at most) to a risk that a denial could occur— were not so "significant … that they 'threaten[ed] to become the focus of the litigation,'" App.40—even though that is *in fact* exactly what happened, App.51-54 (McKeown, J., concurring in part and dissenting in part).

Finally, after affirming the sufficiency of the evidence to establish both FCRA violations and willfulness, App.19-38; *but see Safeco Ins.*, 551 U.S. at 68-69 (willfulness requires proof that defendant "ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless"), the majority held "that the jury's award of statutory damages near the high end of the range was clearly justified." App.49. "With respect to punitive damages," however, it found $6,353.08 per class member "excessive" and "remand[ed] with instructions to reduce [that amount] to $3,936.88 per class member." App.50 (capitalization altered). While this Court has admonished that "[w]hen compensatory damages are substantial," a ratio "equal to compensatory damages[] can reach the outermost limit of the due process guarantee," *State Farm*, 538 U.S. at 425, and the majority acknowledged that the $8 million statutory damages award was "quite substantial," App.47, it nonetheless reduced the punitive damages award only to a ratio of 4:1.

Judge McKeown dissented in significant part. She first noted that "[t]he only asserted uniform classwide experience was the existence of TransUnion's internal terrorist watch list alerts and

16

the mailing of separate letters—faint allegations that strain Rule 23's typicality requirements." App.52 (McKeown, J., concurring in part and dissenting in part). She then explained how that Rule 23 problem flowed from an even more fundamental problem: a lack of Article III standing.

With respect to the reasonable-procedures claim, Judge McKeown concluded that only "the 1,853 individuals whose report was disclosed to third parties have standing." App.56. In her view—and, as she noted, the views of at least three other circuits, App.56—the mere potential that a credit report *could be* divulged to potential creditors "does not amount to a material risk" sufficient for Article III. App.56. As to the disclosure claims, given the complete lack of evidence vis-à-vis anyone but Ramirez, Judge McKeown concluded that "whether any … absent class member was confused, suffered the adverse consequences that befell Ramirez, or even opened the letter, is pure conjecture," App.57—and "[c]onjecture based on an unrepresentative plaintiff does not meet the constitutional minimum," App.51.

## REASONS FOR GRANTING THE PETITION

The decision below is a trifecta of class action abuse. It finds Article III injury for class members who concededly never had an allegedly deficient credit report shared with a third party. It allows a radically atypical plaintiff to use his own atypical and unusually disruptive experiences to secure $8 million in statutory damages on behalf of a class consisting of individuals who concededly did not endure (and could not have endured) anything comparable. And it sustains an additional $32 million in punitive

17

damages on the theory that a 4:1 ratio is constitutionally permissible even though *statutory* damages already punish and deter and this Court has indicated that a 1:1 ratio of punitives to *actual* damages approaches the constitutional limit.   The ultimate result is that "TransUnion now owes 8,185 class members tens of millions of dollars based on the unfortunate and unrepresentative experience of a single plaintiff." App.58 (McKeown, J.).

That result could only occur in the Ninth Circuit, as it is fundamentally incompatible with both this Court's precedents and decisions from circuits that faithfully follow them.  As the D.C. Circuit and other circuits have held, individuals who never had their information disseminated to third parties cannot claim Article III injury based on the bare fact that inaccurate information sat inchoate in a database. *See, e.g.*, *Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*, 879 F.3d 339 (D.C. Cir. 2018). Nor do other circuits allow individuals to claim injury-in-fact just because they were sent a purportedly incomplete disclosure that they may not have read, let alone found confusing.  *See, e.g.*, *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 768 (5th Cir. 2020).  *A fortiori*, other circuits would not allow a plaintiff who *did* suffer actual injuries when a report was disseminated and credit was delayed and vacations were canceled to represent a class of thousands who suffered none of those injuries (or any others).

The consequences of allowing that misguided class to proceed were all too predictable.  Hearing only of the atypical experience of the named plaintiff, the jury awarded statutory damages near the statutory

18

maximum and more than six times as much in punitive damages to each and every class member. For the truly typical member of the class—one whose credit information never reached a third party and who may not have even read the credit information sent only to one's home address—the resulting ratio of punitive damages to actual harm is nearly infinite. Nonetheless, the Ninth Circuit trimmed back the award only marginally, concluding that a punitive award four times greater than a near-maximum statutory award that already punishes and deters is constitutionally permissible.

The combined effect of these egregiously erroneous holdings is a roadmap to exploit atypical plaintiffs and abuse statutory damages provisions to secure outsized damages awards on behalf of classes of uninjured individuals. Left unreviewed, that roadmap will be routinely followed, to the detriment of Article III, Rule 23, and the due process rights of any defendant open to suit in the Ninth Circuit. The Court should grant certiorari and bring the Ninth Circuit's outlier jurisprudence back in line with this Court's precedent.

## I. The Decision Below Conflicts With Cases Of This Court And Other Circuits On Basic Principles Of Article III And Rule 23.

### A. The Conclusion That Every Absent Class Member Had Article III Standing Is Wrong and Creates a Circuit Split.

1. As this Court has reiterated on numerous occasions, a plaintiff cannot "allege a bare procedural violation" of a statute, "divorced from any concrete harm, and satisfy the injury-in-fact requirement of

19

Article III." *Spokeo*, 136 S.Ct. at 1549. Instead, a plaintiff must show that the alleged violation actually "cause[d] harm or present[ed] a[] material risk of harm" of a concrete and particularized nature. *Id.* at 1550. And if the plaintiff alleges a material risk of harm, rather than harm that has in fact come to pass, then the "threatened injury must be *certainly impending* to constitute injury in fact." *Clapper*, 568 U.S. at 409.

Applying those principles, this should have been an easy case. Ramirez did not define his proposed class to include only individuals who suffered an adverse consequence after TransUnion disseminated to a potential creditor a report containing a "potential match" alert. He did not even define it to include only individuals who actually had such a report disseminated. To the contrary, he *stipulated* that no third party—not a potential creditor, a potential employer, or anyone else—ever even saw a credit report for more than 75% of class members. App.14-15.

Instead of focusing his class on individuals who actually suffered some adverse consequence because of the Name Screen product, Ramirez defined it based on whether, in response to a consumer's request to view his *own* credit file, TransUnion sent the consumer a mailing informing him that his name was a "potential match" to a name on the OFAC list. And even then, Ramirez did not even try to prove that any absent class member ever read that letter, let alone suffered some adverse consequence on account of the manner in which TransUnion conveyed that information.

20

Ramirez's ambitious effort to seek tens of millions of dollars in damages on behalf of more than 8,000 individuals should not have proceeded past the threshold. The lone thing members of his proposed class actually had in common—receipt of a letter informing them of a "potential match" and a separate letter containing the required summary of rights—could not demonstrate Article III injury absent individualized evidence. For even accepting that the absurd premise that the mailings were "inherently shocking and confusing," App.32 n.10, one cannot have been shocked by mailings one never read. And given Ramirez's failure even to try to introduce such evidence, whether any "absent class member … even opened the letter[] is pure conjecture." App.57 (McKeown, J.).

And while having an inaccurate report actually sent to a potential creditor certainly *could* hinder someone in obtaining credit, that could happen only if a report was actually disseminated to a third party— which concededly did not occur *for more than 75% of the class*. Even for the minority who did have a report sent to someone, moreover, Ramirez made no effort to prove that *anyone* suffered any adverse consequence as a result. For all one knows, the potential creditor quickly dismissed the "potential match" alert after (as TransUnion instructed) cross-checking it against additional information, such as a birthdate that would make the false positive obvious. (While Ramirez's DealerTrack-produced report said "match" instead of "potential match," no one else's report lacked the "*potential*" modifier. *See* CA9.ER.215.) Simply put, there is no evidence that anyone other than Ramirez suffered any injury at all, let alone any injury

stemming from the actions that he claimed violated FCRA.

2. The Ninth Circuit nonetheless held that all 8,185 class members crossed the Article III threshold. In its view, the bare fact "that TransUnion made the reports available to numerous potential creditors and employers … is sufficient to show a material risk of harm to the concrete interests of all class members" for purposes of the reasonable-procedures claim. App.26-27.  But the reports were "available" only in the sense that *every* piece of information that sits untapped in a database is "available":  They *could* have been sent to a creditor or employer if but only if—contrary to fact—a creditor or employer had asked for one.  Any injury to 75+% of the class thus was not just inchoate, but entirely contingent on a request that never materialized.  That is patently insufficient to satisfy Article III, for even an "objectively reasonable likelihood" of harm is not enough to demonstrate the "*certainly impending*" injury that this Court's precedent demands. *Clapper*, 568 U.S. at 409-10.

The majority's holding that the mere receipt of the "potential match" mailing gave every class member standing to sue on the disclosure claims is just as obviously wrong.  App.32 n.10.  It is highly debatable whether Ramirez even established a FCRA violation (let alone a willful one) with respect to those mailings, as every class member received "[a]ll information in [his] file," 15 U.S.C. §1681g(a)(1), and a complete summary of his rights, *id.* §1681g(c)(2).  Ramirez took issue solely with the fact that TransUnion provided that information in two contemporaneously sent envelopes instead of one, and included the summary

22

of rights in only one of those envelopes. Even assuming that novel theory states a FCRA violation, it is an archetypal example of the kind of technical violation that cannot be *presumed* to inflict concrete injury.

After all, the "primary purpose[]" of §1681g's disclosure requirements "is to allow consumers to identify inaccurate information in their credit files and correct [it]." *Gillespie*, 484 F.3d at 941. Article III therefore requires something more than simply receiving an inaccurate report in need of correction or getting the requisite information in two envelopes rather than one. Instead, each plaintiff must prove that the dual mailings actually impeded his efforts to "obtain the information he needed" to ensure his file is correct. *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 347 (4th Cir. 2017). Ramirez did not and could not do that here. The only evidence he introduced on this issue concerned himself, and he was not impeded; he *succeeded* in contacting TransUnion and getting it to cease including an OFAC alert on future reports after receiving the mailings. CA9.ER413-16. And the evidence TransUnion introduced confirmed that the two-mailing format affirmatively *encouraged* contact with TransUnion regarding OFAC alerts. *See* CA9.ER255-56 (contact rate was lower under single-mailing format).

Instead of focusing on whether receiving the necessary information in two mailings instead of one presented a real risk of harm to the interest Congress sought to protect in §1681g, the Ninth Circuit declared the mailings so "inherently shocking and confusing" that concrete injury could be assumed. App.32 n.10.

23

That is doubly wrong.  First, any injury on the procedural disclosure claims had to stem *from the alleged procedural violations*—*i.e.*, from the fact that all the requisite information was sent in two mailings rather than one.  Shocked as an individual may be to learn that her name is a "potential match" to a name on the OFAC list, no one could seriously claim to be "shocked" that a credit-reporting agency might send that information in a separate mailing sent contemporaneously with a requested credit file, or might include a summary of her FCRA rights in only one of those two contemporaneous mailings.

Moreover, while it may be *possible* that some class members were confused by the manner in which they received the mandated disclosures, what is merely possible is not enough.  "Standing is not 'an ingenious academic exercise in the conceivable.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 566 (1992) (quoting *United States v. SCRAP*, 412 U.S. 669, 688 (1973)).  It requires "a factual showing of perceptible harm."  *Id.*  Yet Ramirez introduced no evidence whatsoever that any absent class member suffered any confusion or complications as a result of receiving the two simultaneous letters.  In fact, he introduced "no evidence … that a single other class member so much as opened the dual mailings."  App.57 (McKeown, J.).  To state the obvious, one cannot be shocked or confused by mailings one did not read.

3. Both of the Ninth Circuit's standing holdings are flatly contrary not only to this Court's precedent, but to decisions of its sister circuits, as Judge McKeown noted in dissent.  The D.C. Circuit's decision in *Owner-Operator Independent Drivers* is illustrative.

24

There, the plaintiffs were "commercial truck drivers" who "claim[ed] they were injured by the Department of Transportation's violation of its statutory obligation to ensure the accuracy of a database containing driver-safety information." 879 F.3d at 340. While "nothing in the record indicate[d]" that any third party "accessed," let alone "used," the allegedly inaccurate information housed in the database, the plaintiffs argued that the information "could easily harm a [plaintiff] were it shared with prospective employers." *Id.* at 343, 347. The court held that even if the database contained inaccurate information about the plaintiffs, they still "suffered no concrete injury in fact sufficient to confer Article III standing" "because dissemination" of their information was "not imminent." *Id.* at 347. In reaching that conclusion, the court explained that it could find "no historical or common-law" support for the notion that "the mere existence of inaccurate information, absent dissemination, amounts to concrete injury." *Id.* at 344-45.

The D.C. Circuit is not alone in reaching that conclusion. Both the Seventh and the Eighth Circuits likewise have found the mere risk that customer data retained in violation of a federal statute might be disseminated insufficient to confer standing. *See, e.g.*, *Gubala v. Time Warner Cable, Inc.*, 846 F.3d 909, 910-11 (7th Cir. 2017); *Braitberg v. Charter Commc'ns, Inc.*, 836 F.3d 925, 930-31 (8th Cir. 2016).

Other circuits have been equally unreceptive to claims that the mere receipt of an allegedly deficient disclosure is enough to satisfy Article III. The Fifth Circuit recently rejected the proposition that mere

25

receipt of an incomplete FCRA disclosure gives rise to Article III injury, noting that "unnamed class members … who received the letter, but ignored it as junk mail or otherwise gave it no meaningful attention," would plainly "lack a cognizable injury under Article III." *Flecha*, 946 F.3d at 768. The Seventh Circuit rejected a plaintiff's effort to sue on behalf of everyone who received a deficient FCRA disclosure when he presented no evidence "plausibly suggesting that he" (or anyone else) "was confused by the disclosure." *Groshek v. Time Warner Cable, Inc.*, 865 F.3d 884, 889 (7th Cir. 2017). The Fourth Circuit rejected an effort to sue on behalf of every consumer who received a report containing certain inaccurate information when there was no evidence that this alleged FCRA violation had any impact on anyone. *Dreher*, 856 F.3d at 342, 345. And the Sixth Circuit rejected a FCRA claim premised on mere receipt of allegedly deficient information when the plaintiff conceded that receipt of the "incomplete report did not 'have any effect on [him] whatsoever.'" *Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 463 (6th Cir. 2019).

In short, it is "pure conjecture" "whether any … class member" here *in fact* "suffered the adverse consequences that befell Ramirez, or even opened the letter." App.57 (McKeown, J.). In any other circuit, that would have precluded Ramirez from seeking millions of dollars on behalf of 8,184 absent class members—as those circuits heed this Court's repeated admonishment that "[c]onjecture based on an unrepresentative plaintiff does not meet the constitutional minimum." App.51 (McKeown, J.); *see, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 499

26

(2009).  The Ninth Circuit's contrary decision is "*SCRAP* for a new generation" of absent class members.  *Massachusetts v. EPA*, 549 U.S. 497, 548 (2007) (Roberts, C.J., dissenting).

**B.  The Conclusion That Ramirez Was Typical of the Class Defied Reality as Well as This Court's Rule 23 Precedents.**

Even assuming the absent class members crossed the Article III threshold, Ramirez's unique experiences and actual injuries still should have precluded class certification, as they made him radically atypical of the class he sought to represent.  To satisfy the typicality requirement, "a class representative must … [have] suffer[ed] the same injury as the class members."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49 (2011); *see* Fed. R. Civ. P. 23(a)(3).  The Ninth Circuit elided that requirement by conflating Article III and Rule 23.  Whether or not the mere receipt of two contemporaneous mailings instead of one or the mere existence of potentially inaccurate reports "exposed every class member to a material risk of harm" sufficient for Article III, App.31-33, an individual who was *actually* injured is simply not typical of a class of individuals who did not suffer anything like the same injuries.

Here, Ramirez *stipulated* that he was radically atypical of more than 75% of the class, and he made no effort to limit his proof to experiences common to the entire class or to prove "that a single other class member" shared his experiences.  App.57 (McKeown, J.).  There is no evidence that anyone other than Ramirez was hindered in an effort to obtain credit (let alone hindered at a retail outlet in front of family

27

members) or that anyone other than Ramirez canceled travel plans on account of concerns over the OFAC alert. There is no evidence that anyone else even read the two mailings, let alone was confounded by their duality or "spent significant time and energy trying to remove the alert." App.39. Yet the Ninth Circuit nonetheless concluded that "the unique aspects of Ramirez's claims" were not so "significant … that they 'threaten[ed] to become the focus of the litigation.'" App.40.

That conclusion blinks reality. One need not speculate—there *was* a trial here, and it *in fact* "focused on Ramirez and his unique circumstances" to the exclusion of any "story of the absent class members." App.51, 53 (McKeown. J.). Of course it did. Any rational class counsel would rather tell the story of a plaintiff who was impeded in his efforts to obtain credit while his wife and father-in-law looked on than talk about the typical experience of a class member whose credit report was never even seen by a third party. Concrete examples of credit denied, embarrassment suffered, and vacations canceled are far more likely to generate statutory damages near the maximum (and punitive damages to boot) than less dramatic but far more typical stories of two letters rather than one received at a home mailing address. That is presumably why counsel implored the jury to look at "what happened to Mr. Ramirez," not anyone else, in assessing damages. CA9.ER257-58.

In other circuits, a class of plaintiffs subject to a procedural shortcoming without any accompanying concrete injury would have been stymied at the outset by the lack of standing. *See supra* pp.23-25. But even

28

assuming that some absent class members crossed the Article III threshold, they could not be properly represented by a named plaintiff who suffered far greater and much different injuries any more than individuals who suffered only superficial injuries could be represented by a named plaintiff who suffered dismemberment.    Rule 23 and its typicality requirement prevent such unrepresentative and fundamentally unfair class proceedings.  *See* App.53-54 (McKeown, J.).

## II.  **The Ninth Circuit's Punitive Damages Analysis Defies Due Process And This Court's Cases.**

It is remarkable enough that the Ninth Circuit allowed Ramirez to sue on behalf of 8,184 uninjured class members.  That the court affirmed more than *$40 million* in statutory and punitive damages is extraordinary.  As this Court has made clear, "[w]hen compensatory damages are substantial," a punitive damages award "perhaps only equal to compensatory damages[] … reach[es] the outermost limit of the due process guarantee." *State Farm*, 538 U.S. at 425.  The Ninth Circuit readily acknowledged that "$8 million in statutory damages is quite substantial."    App.47. Indeed, while "the touchstone" for reviewing punitive damages awards is the total "class recovery," not each "individual award," *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 515 n.28 (2008), an award of $984.22 per person for hyper-technical FCRA violations that most of the class probably did not even know occurred is substantial by any measure.

That alone should have provided sufficient basis to limit the punitive damages award to (at most) $8

29

million, *i.e.*, equal to the underlying damages award. But the nature of the underlying damages award here makes the constitutional concerns with far larger punitive damages awards all the more acute. The underlying damages award that the Ninth Circuit used as the basis for its 4:1 ratio does not represent compensatory damages (and thus the jury's assessment of actual harm). Ramirez did not even *seek* compensatory damages on behalf of the class (presumably because such damages are plaintiff-specific and most suffered no actual injury at all). Ramirez instead sought a classwide award of *statutory* damages—and received an award just shy of FCRA's $1,000 statutory maximum. *See* 15 U.S.C. §1681n(a). The $8 million award here thus was not a measure of "the actual … harm suffered by the plaintiff[s]," *State Farm*, 538 U.S. at 418, but was instead itself intended (as statutory damages permissibly may be) to punish and deter. *See St. Louis, I. M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66 (1919); *On Davis v. The Gap, Inc.*, 246 F.3d 152, 172 (2d Cir. 2001). That is clear from the record, for Ramirez not only introduced *no evidence* that any absent class member suffered any compensable injury, but openly implored the jury to award the highest end of the statutory range to impose the "maximum penalty" on TransUnion. CA9.ER258.

That makes this a particularly obvious case for application of the rule that a punitive damages award "equal to" the jury's underlying award "reach[es] the outermost limit of the due process guarantee." *State Farm*, 538 U.S. at 425. After all, because punitive damages awards and statutory damages are both designed to punish and deter, there is a very real risk that awarding punitive damages on top of statutory

30

damages constitutes unconstitutionally duplicative punishment. Indeed, it is far from clear that even a 1:1 ratio would satisfy due process when the second number is not a measure of "the actual … harm suffered by the plaintiffs." *State Farm*, 538 U.S. at 418. Put differently, the jury's statutory damages award is not even a good proxy for the actual damages suffered by a typical class member, and the true ratio of punitive damages to actual harm in this case approaches infinity and far exceeds constitutional bounds.

The Ninth Circuit nonetheless reduced an award it recognized as unconstitutional only to a 4:1 ratio, without even so much as acknowledging the need to account for the statutory damages nature of the base amount or the double recovery concerns that TransUnion repeatedly highlighted. Instead, the majority proceeded as if this Court had declared 4:1 the constitutional floor, and simply edited out of its description of *State Farm* the Court's admonition that due process may allow no more than an award *"equal to compensatory damages"* when, as here, the underlying award is "substantial." 538 U.S. at 425 (emphasis added). *See* App.47.

That blasé approach to massive damages awards is irreconcilable both with this Court's cases and with cases from other circuits faithfully applying them. Other circuits have not hesitated to find much lower awards sufficiently "substantial" to demand a 1:1 ceiling even without the duplicative punishment problem that arises from a statutory damages award. *See, e.g.*, *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1075 (10th Cir. 2016) (finding 1:1 ratio "the

31

appropriate limit of due process" given "substantial compensatory damages [of] almost $1 million"); *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 799 (8th Cir. 2004) (reducing punitive damages to 1:1 ratio given $600,000 compensatory damages award—"a lot of money"). *A fortiori*, a multimillion-dollar statutory award like this one could never justify a 4:1 punitive damages award in those circuits.

This case thus provides the Court with an ideal opportunity to reinforce that 1:1 is indeed the ceiling for the vast majority of punitive damages cases in which the jury has already issued a substantial award. It also provides the Court with an ideal opportunity to make clear that the ratio analysis in a statutory damages case must focus on "the actual … harm suffered by the plaintiff[s]," *State Farm*, 538 U.S. at 418, not simply on the base number of a statutory damages award that may already reflect a substantial degree of punishment and deterrence.

## III. The Questions Presented Are Exceptionally Important.

The Ninth Circuit's trifecta of untenable rulings will reverberate well beyond this case—and well beyond the FCRA context. The class action was designed to be "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart*, 564 U.S. at 349 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)); *see also, e.g.*, *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013). Yet, in many jurisdictions (particularly the Ninth Circuit), it has become the rule rather than the exception. Indeed, one recent study found that 60% of major U.S.

32

companies were embroiled in federal class action litigation in 2017. *See The 2018 Carlton Fields Class Action Survey* 6 (2018), https://bit.ly/2WBMs17.

That alone is reason to carefully scrutinize any decision that makes it substantially easier to bring class actions, as "[c]ertification of a large class may so increase the defendant's potential damages liability and litigation costs that he may find it economically prudent to settle and to abandon a meritorious defense." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 476 (1978), *superseded on other grounds by rule as stated in Microsoft Corp. v. Baker*, 137 S.Ct. 1702 (2017). And that concern is amplified when the cause of action permits recovery of punitive damages, for "the risk of suffering a crushing punitive damages penalty" on its own often "gives rise to so-called 'blackmail settlements' in which defendants pay more than the … claims are reasonably worth." James A. Henderson, Jr., *The Impropriety of Punitive Damages in Mass Torts*, 52 Ga. L. Rev. 719, 747 (2018).

But all of those concerns are even more acute when it comes to class actions under statutes like FCRA that allow for statutory damages as well as punitive damages. To be sure, statutory damages can be an important and effective tool for dealing with unlawful conduct that causes injuries that may be difficult to quantify. *See, e.g.*, *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 348-55 (1998) (describing history of statutory damages for copyright infringement). But they also have the potential for massive abuse, particularly when combined with the class action device and punitive damages awards. *See, e.g.*, *Parker v. Time Warner Ent. Co.*, 331 F.3d 13, 22

33

(2d Cir. 2003) (noting due process concerns that "arise from the effects of combining a statutory scheme that imposes minimum statutory damages awards on a per-consumer basis … with the class action mechanism that aggregates many claims."). That concern with the combined effect of statutory damages, punitive damages, and class actions is particularly acute because the availability of statutory damages often obviates the need to prove compensatory damages, which tend to be individualized and thus less suited to class treatment. Without proof of compensatory damages, there is no reliable indicator of actual harm to facilitate meaningful due process review of any resulting punitive damages award. This case well illustrates the problem, as a plaintiff who suffered actual compensatory damages eschewed proving them in favor of pursuing statutory and punitive damages on behalf of the class.

All of that makes it particularly critical for this Court to be vigilant about enforcing Article III, Rule 23, and due process principles in this context. It is one thing to offer an individual plaintiff the option of accepting a small measure of damages without proving up the precise dollars-and-cents impact of her injuries. It is another thing to offer a plaintiff the option of recovering such damages on behalf of a class of individuals for alleged legal violations that cause little or no tangible harm. *See Spokeo*, 136 S.Ct. at 1549-50. It is yet another thing altogether to allow that classwide award of statutory damages, which are themselves designed to punish and deter without necessarily reflecting the amount of actual harm to

34

the class, to be the justification for awarding four times as much in punitive damages.

The decision below permits all of that in a case that would be thrown out at the jurisdictional threshold in most circuits. The combined effect of its rulings on Article III, Rule 23, and punitive damages provides a roadmap that, if left unreviewed, will be followed by countless class action lawyers in the Ninth Circuit. The process of identifying a particularly sympathetic named plaintiff, forgoing proving up her actual damages in lieu of a demand for substantial statutory and punitive damages, and defending the resulting punitive damages award as merely a multiple of statutory damages is neither difficult to replicate nor limited to FCRA. Numerous federal statutes allow for punitive damages on top of statutory damages. *See, e.g.*, 12 U.S.C. §3417(a) (authorizing $100-per-violation "statutory damages" plus "actual damages" as well as "punitive damages"); 18 U.S.C. §248(c)(1) (authorizing "compensatory" or "statutory damages," plus "punitive damages"); 18 U.S.C. §2520 (authorizing "actual" or "statutory damages," plus "punitive damages"). And as this Court recently recognized, damages "can add up quickly in a class action" when statutory damages are available. *See Barr v. Am. Ass'n of Pol. Consultants*, 140 S.Ct. 2335, 2345 (2020) (plurality op.). Those concerns are particularly acute with FCRA, which does not cap a defendant's liability in class actions. *Compare, e.g.*, 15 U.S.C. §1640(a)(2)(B), *and id.* §1692k(a)(2)(B), *with id.* §1681n (FCRA). That makes the need for this Court's review all the more pressing.

35

In short, the decision below manages to eviscerate Article III, Rule 23, and due process constraints on statutory damages class actions all at once, leaving no meaningful check on abuse of the many federal statutes that authorize recovery of statutory damages. In the process, it reaffirms the Ninth Circuit's status as an outlier on both standing and class actions, as well as the need for this Court's intervention. This is an ideal case in which to consider the questions presented, as it is the rare class action that was litigated to final judgment, with every question pressed and passed upon in both courts below. The Court should grant certiorari and ensure that the decision below does not become a roadmap for abuse of statutory damages provisions, the class action device, and the federal courts.

36

## CONCLUSION

For the foregoing reasons, this Court should grant the petition.

Respectfully submitted,

| | |
|---|---|
| JULIA B. STRICKLAND | PAUL D. CLEMENT |
| STEPHEN J. NEWMAN | *Counsel of Record* |
| CHRISTINE E. ELLICE | ERIN E. MURPHY |
| STROOK & STROOK | MATTHEW D. ROWEN |
| & LAVIN LLP | KIRKLAND & ELLIS LLP |
| 2029 Century Park E. | 1301 Pennsylvania Ave., NW |
| Los Angeles, CA 90067 | Washington, DC 20004 |
| | (202) 389-5000 |
| | paul.clement@kirkland.com |

*Counsel for Petitioner*

September 2, 2020